**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FAITH H.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 1:20-cv-04311** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey I. Cummings** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Faith H. ("Claimant") moves to reverse or remand the final decision of the Commissioner

of Social Security ("Commissioner") denying her claim for disability insurance benefits

("DIBs") and Supplemental Security Income ("SSI"). The Commissioner filed a response

seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of

a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to

hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons herein,

Claimant's motion to reverse the decision of the Commissioner, (Dckt. #18), is denied and the

Commissioner's motion to uphold the decision to deny benefits, (Dckt. #23), is granted.

**I.      BACKGROUND**

**A.      Procedural History**

In June 2017, Claimant (then forty-four years old) filed applications for SSI and DIBs,

alleging disability dating back to June 26, 2017, due to limitations from major depression,

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court
refers to plaintiff only by her first name and the first initial of her last name. Acting Commissioner of
Social Security Kilolo Kijakazi has been substituted as the named defendant. Fed.R.Civ.P. 25(d).

anxiety, and post-traumatic stress disorder ("PTSD"). (Administrative Record ("R.") 267). Her claim was denied initially and upon reconsideration. (R. 16). Claimant filed a timely request for a hearing, which was held on April 3, 2019, before Administrative Law Judge ("ALJ") Janice Bruning. (R. 45-67). On June 26, 2019, the ALJ issued a written decision denying Claimant's application for benefits. (R. 13-31). The Appeals Council denied review on May 27, 2020, (R. 1-7), leaving the ALJ's decision as the final decision of the Commissioner. This action followed.

## B. The Social Security Administration Standard to Recover Benefits

To qualify for disability benefits, a claimant must demonstrate that she is disabled, meaning she cannot "engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). At step two, the SSA determines whether a claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. §404.1521. An impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* In other words, a physical or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If a claimant establishes that she has one or more physical or mental

impairments, the SSA then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, she is considered disabled, and no further analysis is required. If the listing is not met, the analysis proceeds. 20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), or her capacity to work in light of the identified impairments. Then, at step four, the SSA determines whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id.* If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given her RFC, age, education, and work experience. If such jobs exist, she is not disabled. 20 C.F.R. §404.1520(a)(4)(v).

### C. The Evidence Presented to the ALJ

Again, Claimant seeks benefits due to limitations from major depression, anxiety, and PTSD. (R. 267). Her alleged onset date is June 26, 2017, and her date last insured is December 31, 2023. (R. 15). The record contains the following relevant evidence that bears on her claim:

#### 1. Evidence from Claimant's Medical Records

Claimant has a history of psychosis, mood instability, and anxiety. (R. 298-99). She has been diagnosed with "major depressive disorder, recurrent, moderate," (R. 347), and began

receiving mental health treatment from the DuPage County Health Department, ("DCHD") on September 15, 2015.  (R. 305).  When she began treating with DCHD, Claimant reported feeling overwhelmed, helpless, and numb.  (R. 304).  She became frustrated easily and was always tired.  (*Id.*).  She also demonstrated paranoia regarding her estranged family.  (*Id.*).  She told providers that in the past, her mood, paranoid thoughts, and isolative behavior had resulted in her becoming homeless.  (R. 304).  Claimant has four children, but she does not have custody over them and has not seen them in more than seven years.  (R. 360).

At an October 28, 2016 appointment, it was noted that Claimant had attained housing through PADS, a subsidized supportive housing program, and was working full-time at a store called Savers.  (*Id.*).  Claimant stated that her medications were helping her focus and function.  (*Id.*).  Her Global Assessment of Functioning ("GAF") score at the time was a 57, indicating moderate symptoms or "moderate difficulty in social, occupational, or school functioning."[2]  (R. 301).  On May 2, 2017, Claimant told DCHD providers that she had lost her full-time job at Savers and began working part-time at TJ Maxx, which she enjoyed.  (R. 340).  Although she was anxious about the change, Claimant said that she had been "able to cope and work through her anxiety."  (*Id.*).  She reported good sleep, appetite, and concentration.  (*Id.*).

Claimant subsequently left TJ Maxx and began working part-time at Goodwill.  On August 1, 2017, Claimant noted that her "life [was] much better since she changed her job to Goodwill as her anxiety there [was] much less and [she liked] the environment."  (R. 345).  Claimant presented as fully oriented with a coherent and logical thought process, intact judgment, attention, and concentration, and partial insight, however she also reported sleeping

---

[2] The GAF score is a numeric scale from 0 through 100 used to assess severity of symptoms and functional level.  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32* (4th ed. text revision 2000). Although the American Psychiatric Association recently discontinued use of the GAF score, it was still in use during Claimant's relevant examinations.  *See id.*, at 16 (5th ed. 2013).

too much, decreased interest in activities, poor concentration, low energy, and low motivation. (R. 345-46). She felt that she had to "force herself" to do things like go to church. (*Id.*). It was noted that ongoing treatment was necessary to "prevent decompensation in illness." (R. 348).

On August 17, 2017, Claimant reported "feeling better" and enjoying activities. (R. 350). She stated that she had enough energy to do her job and that her concentration was "okay." (*Id.*). Despite these reports and a normal mental status exam, Claimant's GAF score had declined to 38, indicating "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."[3] (R. 351). Later that month, Claimant reported to a crisis center due to suicidal ideations. (R. 355). She remained in the center for three days and the doctors adjusted her prescriptions. (*Id.*). On August 24, 2017, Claimant reported feeling better, with no suicidal ideations, clearer thinking, good sleep and appetite, and no mania or psychosis. (*Id.*). Although she reported feeling overwhelmed and anxious at work, she was performing well. (*Id.*). She was fully oriented with no memory impairments or delusions, intact judgment, and a normal affect. (R. 356).

On October 3, 2017, Claimant was "still down," but no longer anxious. (R. 360). Her mental status evaluation was normal, but her GAF remained a 38. (R. 361). Two weeks later, she reported restlessness and difficulty concentrating. (R. 365). Even so, she felt that part-time work "suited her" much better than full-time work, which she said aggravated her depression. (*Id.*). Claimant was engaging in leisure and community activities, maintaining meaningful relationships, and managing her emotions. (*Id.*). She could perform household tasks, cook, maintain personal hygiene, and administer her own medications. (R. 366). Claimant presented as fully oriented with normal attention, concentration, long and short-term memory, judgment,

---

[3] *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32* (4th ed. text revision 2000).

thought process, and fund of knowledge. (R. 372). She was pleasant and cooperative. (R. 374). Although Claimant reported experiencing some paranoia, anxiety, and increased crying, her GAF score had risen back to a 57. (R. 372-74).

On November 28, 2017, Claimant reported ongoing symptoms of depression, but no excessive worry or panic. (R. 384). She was performing well at work and had a normal mental status evaluation. (R. 384-85). Although she was experiencing delusional thoughts regarding her family, her GAF remained a 57. (R. 385-86).

In February 2018, Claimant told providers that she was benefiting from regular exercise and attending church. (R. 406). On March 20, 2018, she reported feeling "really good." (R. 418). She was enjoying activities, staying on a routine, socializing, performing well at work, and sleeping well. (*Id.*). She did not feel sad or overwhelmed. (*Id.*). On July 24, 2018, Claimant noted that it was easier to get out of bed in the mornings and that she was not feeling depressed or anxious. (R. 462). She had lost fifteen pounds and was performing well at work. (*Id.*). On November 6, 2018, Claimant again reported that she was performing well at work and her medications were "working well." (R. 468). She also noted that she had stopped attending therapy because it made her "too emotional." (*Id.*).

On August 2, 2018, Claimant's treating provider indicated that Claimant "has difficulty managing full time work." (R. 451). She noted that Claimant struggles with thoughts and mood when her "workload increases or becomes too fast paced" and improves with "limited work hours." (R. 453). On January 10, 2019, Claimant reported increased anxiety. (R. 474). She stated that she was performing well at work but had called in sick twice. (*Id.*). She denied persistent sadness or hopelessness. (*Id.*). On February 7, 2019, Claimant stated that she had no energy or motivation and had missed a few days of work due to depression. (R. 426).

### 3.     Evidence from State Agency Consultants

State agency psychological consultant M. W. DiFonso, Psy.D., reviewed Claimant's file on October 17, 2017.  She found that Claimant had a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentration, persistence, and pace; and a mild limitation in adapting or managing herself.  (R. 72).  Dr. DiFonso also indicated that evidence did not establish the presence of the "paragraph C" criteria.  (*Id.*).  Referencing Claimant's treatment notes, she found Claimant's "cognitive and attentional skills" were intact and sufficient for simple, one-to two-step as well as multiple-step tasks.  (R. 75).  Claimant's ability to carry out detailed tasks was moderately limited by her depression, as were her interpersonal skills.  (*Id.*).  Dr. DiFonso concluded that Claimant was capable of multiple-step productive activity with modified social demand and, therefore, was not disabled.  (R. 75, 77).  State agency psychological consultant Tyrone Hollerauer, Psy.D., reviewed Claimant's file on February 23, 2018, and reached the same findings as Dr. DiFonso.  (R. 96-101).

### 4.     Evidence from Claimant's Case Manager

Katie Arellano is a case manager who works with Claimant as part of the PADS housing program.  Ms. Arellano completed a report on Claimant's behalf on August 27, 2018.  She opined that Claimant's illness markedly restricted her activities of daily living because it caused her to "feel tired [and have] slower reaction times, trouble concentrating."  (R. 424).  According to Ms. Arellano, Claimant's impairment markedly restricted her socialization because she "isolates herself when feeling depressed."  (*Id.*).  It also markedly impacted her ability to sustain concentration and attention, frequently resulting in failure to complete tasks (although she noted that Claimant completed tasks when not doing so "puts her at risk of losing housing, etc.").  (R.

425).  Ms. Arellano described the PADS housing where Claimant lives as a highly supportive and protective setting.  (*Id.*).  Outside of this setting, she theorized that Claimant "would have more financial barriers, which would create a more stressful environment," thereby exacerbating Claimant's depression, and increasing her suicidal ideations.  (*Id.*).  Ms. Arellano concluded that Claimant was not able to function in a competitive work setting on a full-time basis. (*Id.*).

Ms. Arellano also testified on Claimant's behalf at the hearing.  She noted that it took Claimant longer than most people to complete an assessment, which she suggested was due to Claimant's limited ability to concentrate. (R. 64-65).  She also testified that Claimant regularly missed scheduled meetings due to fatigue and depression. (R. 65-66).  Ms. Arellano noted that Claimant "isolates a lot" and "has no engagement with friendships." (R. 66).

### 5.    Evidence from Claimant

Claimant has a bachelor's degree in education. (R. 296).  At the time of her hearing, she was working twenty hours per week at Goodwill. (R. 50).  Claimant testified that she becomes "almost incapacitated" if she works two days in a row because her "symptoms of depression flare up." (R. 51).  She also stated that when she worked full-time, her depression worsened, and she required additional medication. (*Id.*).  Claimant sleeps until about 10 or 11 a.m. on days that she does not work. (*Id.*).  She can perform household chores, enjoys reading, drives regularly and is learning sign language. (R. 52-53).  She does not have any friends, but she has an emotional support dog, which she feeds and takes outside. (R. 55).

According to Claimant's records from Goodwill, she was tardy seven times and absent three times over a twelve-month period. (R. 32).  Between August 2017 and May 2019, Claimant called in sick at least eleven times. (R. 33-44).

### D.      The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to

deny Claimant's request for benefits.  At step one, the ALJ found that Claimant had not engaged

in substantial gainful activity since her alleged onset date of June 26, 2017.  (R. 18).  At step two,

the ALJ determined that Claimant suffered from the severe impairments of anxiety disorder and

depression.  (R. 19).

At step three, the ALJ concluded that Claimant did not have an impairment or

combination of impairments that met or medically equaled one of the Commissioner's listed

impairments.  (*Id.*).  In support of this finding, the ALJ assessed the so-called "paragraph B

criteria" and found that Claimant's impairments caused a mild limitation in understanding,

remembering, or applying information; a moderate limitation in interacting with others; a

moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in

adapting or managing herself.  (R. 19-21).  The ALJ further concluded that the evidence failed to

establish the presence of the "paragraph C" criteria, finding Claimant did not live in a highly

structured setting and did not have minimal capacity to adapt to changes in her environment or

demands that are not already a part of her daily life.  (R. 21-22).

Before turning to step four, the ALJ determined that Claimant had the RFC to perform a

full range of work at all exertional levels with the following non-exertional limitations:

"[C]laimant can understand, remember, and carry out no more than simple routine tasks

performing the same tasks day in and day out with no public contact and no more than

occasional contact with coworkers and supervisors."  (R. 22).  Based on this finding, the ALJ

determined at step four that Claimant was not capable of performing her past relevant work as a

school teacher.  (R. 26).  Even so, at step five, the ALJ concluded that a sufficient number of jobs

existed in the national economy that Claimant could perform given her age, education, work experience, and RFC, including the representative positions of cleaner, laundry worker, and assembler.  (R. 26-27).  As such, the ALJ found that Claimant was not under a disability at any time from June 26, 2017, through the date of her decision.  (R. 27).

## II.    STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted).  The Commissioner's decision must also be based on the proper legal criteria and be free from legal error.  *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d

589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

## III. ANALYSIS

Claimant raises four arguments in support of remand, asserting that: (1) the ALJ failed to properly account for the so-called "paragraph C" criteria in the RFC assessment; (2) the RFC restrictions do not adequately account for her mental limitations; (3) the ALJ's assessment of her subjective complaints was patently wrong; and (4) the ALJ improperly discredited the opinions of her case manager and mental health provider. Respectfully, the Court disagrees on all counts.

### A. The ALJ properly considered the paragraph C criteria when assessing Claimant's RFC.

Under paragraph C, a claimant who alleges that her mental impairment meets a listing must show the impairment is "serious and persistent," as demonstrated by "a medically documented history of the disorder over a period of at least [two] years," and evidence of both:

> (1) [m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder . . .; *and*
>
> (2) [m]arginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis in original). Here, the ALJ found the evidence did not establish that Claimant: (1) had been receiving ongoing consistent therapy or support that diminished the symptoms and signs of her mental impairments; (2) lived in a highly structured setting; or (3) had minimal capacity to adapt to changes in her environment or demands that are not already a part of her daily life. (R. 21-22). Although Claimant now contests these findings – arguing that she lives in a structured setting and has minimal capacity to adapt to changes or new

11

demands – she does *not* argue that she met or equaled a listing.  (Dckt. #18 at 11).  Instead, she alleges that, as a result of these step-three errors, the ALJ "failed to account for the impact of [Claimant's] protective living environment on her ability to function as well as she does."  (Dckt. #18 at 12).

Claimant's step three argument fails for three reasons.  First, the Court finds no evidence to suggest that it was the "highly structured" nature of Claimant's subsidized apartment that – in and of itself – diminished her symptoms.  To begin, the ALJ asked during the hearing whether it was Claimant's homelessness – rather than her mental health – that qualified her for the apartment in the first place, and Claimant's counsel confirmed that it was the former, which supports the ALJ's finding in this regard. (R. 22, 50).  And, while Claimant argues that she "must live in such a setting because she is unable to function independently," (Dckt. #18 at 11),[4] the only evidence she cites does not support this proposition.  Instead, the record reveals that her case manager, Ms. Arellano, was concerned that the financial consequences of losing the subsidized apartment would adversely impact Claimant's mental health.  Specifically, Ms. Arellano indicated that if Claimant lost the apartment, she "would have more financial barriers which would create a more stressful environment" and this stress would trigger her depression and lead to suicidal ideation.  (R. 425).  This suggests that it was the financial stability offered by the subsidized apartment – rather than its structured nature – that kept Claimant's symptoms at bay.  In any case, Claimant cites no medical evidence indicating that she required a structured living arrangement because of her mental impairments.

Second, even if the record indicated that Claimant required the structured nature of her housing program for purposes of her mental health, it is unclear what additional RFC

---

[4] In particular, Claimant suggests that her case manager found that if she were "forced to function outs[ide] this setting she would be more stressed with increased suicidal ideation." (Dckt. #18 at 11).

accommodations should have been included to account for such a limitation. Claimant's failure to explain how her alleged need for structured housing affects her capacity to work dooms her paragraph C argument. *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (remand not warranted where claimant fails to identify what work restrictions might address her limitations); *Saunders v. Saul*, 777 Fed.Appx. 821, 825 (7th Cir. 2019) (upholding RFC where claimant suggested no "better way to capture the idea behind [alleged limitations] and apply those problems to job requirements"); *Lemerande v. Berryhill*, No. 17-C-190, 2018 WL 1061462, at *7 (E.D.Wis. Feb. 26, 2018) (without evidence from a medical source or the claimant as to how a certain impairment will limit functional capacity, courts will not fault the ALJ for "failing to create limitations of [her] own").

Finally, Claimant argues that "she has minimal capacity to adapt to changes or new demands." (Dckt. #18 at 11). The Court notes that the ALJ acknowledged the evidence Claimant cites in support of this marginal adjustment argument – namely, her own reports that she benefits from part-time work and a treatment note from her mental health provider indicating the same – in the RFC assessment and found it to be unpersuasive. (*See* R. 24-25). As the Seventh Circuit has recently reaffirmed, "claimants cannot simply point to evidence the ALJ considered and rejected and ask this court to infer greater limitations from it. Instead, they must engage with the ALJ's analysis and show why it was either illogical or unsupported." *Dzafic v. Kijakazi*, __ Fed.Appx. __, 2023 WL 2536340, at *5 (7th Cir. Mar. 16, 2023). As in *Dzafic*, Claimant here "does neither," and her argument on this point does not support reversal. *Id*.

In sum: because Claimant cannot show that (1) her mental impairment meets the paragraph C criteria; or (2) that the ALJ failed to adequately consider limitations related to the paragraph C criteria in the RFC assessment, the Court finds no reversible error here.

**B.      The ALJ properly accounted for Claimant's mental limitations in the RFC.**

The ALJ found that Claimant has moderate limitations in both interacting with others and concentrating, persisting, or maintaining pace.  (R. 20-21).  To accommodate these limitations, the ALJ provided the following restrictions: "[C]laimant can understand, remember, and carry out no more than simple routine tasks performing the same tasks day in and day out with no public contact and no more than occasional contact with coworkers and supervisors."  (R. 22).  For a variety of reasons, Claimant now argues that these restrictions are insufficient to account for her specific deficits.  (Dckt. #18 at 7).

An ALJ's RFC findings are intended to capture "the most [a claimant] can still do despite [her] limitations."  20 C.F.R. §416.945(a)(1); *see also Moon v. Colvin*, 763 F.3d 718, 720 (7th Cir. 2014), *as amended on denial of reh'g* (Oct. 24, 2014) ("Residual functional capacity is the extent to which a person can still work despite having health problems.").  Claimant is right to note that, when assessing mental RFCs, the Seventh Circuit has "repeatedly rejected the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace."  *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014); *see also DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019); *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019) (citing cases).  But the analysis does not end there.  "[A]n ALJ has some latitude with the exact wording of an RFC as long as it conveys in some way the restrictions necessary to address a claimant's limitations."  *Recha v. Saul*, 843 Fed.Appx. 1, 4 (7th Cir. 2021).

Accordingly, the Seventh Circuit has "let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to

14

perform." *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) (internal citations omitted). In other words, the same restrictions outlined here may suffice, so long as they clearly account for the Claimant's specific limitations. In particular, the Seventh Circuit has found that an RFC is adequately tailored to a claimant's individualized needs in cases where the ALJ relied on the opinions of medical experts who explicitly found that such limitations would suffice. *See Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021) (ALJ's reliance on state agency consultants' opinions to account for limitation in maintaining CPP was permissible); *Delong v. Saul*, 844 Fed.Appx. 894, 900 (7th Cir. 2021) (same); *Recha*, 843 Fed.Appx. at 4 (same); *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) (same).

Here, state agency consultants Drs. DiFonso and Hollerauer found that despite Claimant's moderate CPP limitations, her "cognitive and attentional skills [were] intact and adequate for simple one-two step tasks as well as multiple step tasks." (R. 75, 100). The ALJ found these opinions to be "persuasive," (R. 24), and it was reasonable for the ALJ to rely on these opinions – the only medical opinions in the record regarding Claimant's functional capacity – when crafting Claimant's RFC. *Morrison v. Saul*, 806 Fed.Appx. 469, 474 (7th Cir. 2020) (relying on the opinion of a medical expert is a "permissible way of 'translating' medical evidence into work-related restrictions."); *Carla G. v. Kijakazi*, No. 19 C 5945, 2022 WL 345075, at *8 (N.D.Ill. Feb. 4, 2022) (noting that a restriction will generally be found sufficient "where the ALJ draws it from the narrative assessment of a doctor"). Indeed, the ALJ went further by adding a limitation that Claimant should perform the same tasks day in and day out "in consideration of her complaints with concentration so she would not have to learn to do new tasks on a regular basis." (R. 24).

Claimant insists that additional restrictions were necessary, arguing that she is unable to work more than twenty hours per week or two consecutive days. (Dckt. #18 at 10). "But even if the record could support such limitations, there is nothing that compels them." *Delong*, 844 Fed.Appx. at 900 (finding the ALJ did not need to limit claimant to additional breaks and a certain amount of off-task time when no medical professional found that such limitations were necessary). The ALJ addressed Claimant's complaints regarding full-time work in the RFC and found the evidence she cited in support of a limitation to part-time work was not persuasive. (*See* R. 24-25; Section III(A), *supra*). Accordingly, Claimant's mental limitations argument – which is essentially a list of her subjective complaints – amounts only to an invitation to reweigh the evidence in her favor, which the Court cannot do. *See Karr*, 989 F.3d at 513; *Ivair M. v. Berryhill*, No. 18 C 3884, 2019 WL 2085139, at *4 (N.D.Ill. May 13, 2019) ("Instead of point to any specific errors in the RFC, Plaintiff recites his diagnosis, treatment, and complaints. But this does not establish work-related limitations or show that the ALJ should have included additional limitations in the RFC.").[5]

### C. The ALJ's assessment of Claimant's subjective complaints was not patently wrong.

It is well settled that any challenge to the ALJ's symptom evaluation faces a high hurdle, as the Court will not overturn the ALJ's credibility finding unless it is "patently wrong," meaning it lacks any explanation or support in the record. *Elder*, 529 F.3d at 413-14. Despite

---

[5] While Claimant also appears to take issue with the ALJ's assessment of her ability to interact with others, (Dckt. #18 at 8), she does not contest the ALJ's finding that she had a moderate limitation in this area, nor does she suggest that the ALJ's restriction to "no public contact and no more than occasional contact with coworkers and supervisors" was insufficient to account for this limitation. Because it is unclear what aspect of the ALJ's "interacting with others" assessment with which Claimant takes issue, any argument related to this portion of the ALJ's analysis is waived. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.").

this deferential standard, Claimant argues that the ALJ erred in two ways when assessing her subjective complaints. She accuses the ALJ of: (1) failing to mention records documenting exacerbations in Claimant's symptoms; and (2) giving too much weight to Claimant's ability to work part-time and further misconstruing evidence related to her part-time work. These arguments are largely undeveloped by the Claimant. Even so, the Court will address each point to the extent it is possible to do so based upon her briefing.

### 1. The ALJ did not "cherry pick" evidence regarding Claimant's depression symptoms when discounting her subjective complaints.

Although an ALJ "is not required to address every piece of evidence or testimony presented," *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), she may not "cherry pick" pieces of evidence that support a conclusion of disability while ignoring related evidence that undermines that conclusion. *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014). Here, Claimant takes particular issue with the ALJ's finding that an August 2017 downturn in Claimant's mental health – during which Claimant's GAF score dropped to 38 and suicidal ideations led to a three-day stay in a crisis center – was "only temporary," as evidenced by records documenting her continued improvement in the following years. (R. 24).

Claimant suggests that, in reaching this finding, the ALJ neglected to mention six treatment notes reflecting "exacerbations" of Claimant's depression symptoms. (Dckt. #18 at 12). Per the Court's review, however, the treatment notes that Claimant accuses the ALJ of ignoring do *not* show an exacerbation of symptoms. At worst, they show that Claimant's symptoms were ongoing. But mostly, they show improvement. (R. 360) (October 3, 2017 note that while Claimant's mood was "still down," a "black cloud" had been lifted and she was no longer anxious); (R. 365) (October 17, 2017 note that while "some days" were still a struggle for Claimant, she was managing her symptoms on medication and things "were better"); (R. 384)

(November 28, 2017 note indicating that while Claimant continued to struggle with an "overall sense of depression," she reported no excessive worry or panic, fair sleep and appetite, performing well at work, no mania, no delusions, and no suicidal ideations); (R. 468) (Claimant still depressed, but better); (R. 474) (January 10, 2019 note indicating that while Claimant's mood had been "more anxious," she was performing well at work and reported no persistent sadness or hopelessness, no mania or psychosis, and no thoughts of self-harm).[6]  Importantly, Claimant's GAF score remained a 57 – indicating only moderate symptoms – from October 2017 through the most recent record provided from January 2019.  (R. 476-77).

Because the evidence cited by Claimant largely supports – rather than contradicts – the ALJ's finding that her mental health limitations were not "marked" following the August 2017 downturn, Claimant's argument that the ALJ committed impermissible cherry-picking when discounting her complaints is unsupported and unpersuasive.

## 2. The ALJ did not commit reversible error when assessing evidence related to Claimant's part-time work.

Claimant next contends that the ALJ improperly considered her part-time employment at Goodwill in at least two respects.  First, Claimant argues that the ALJ "falsely asserted that the evidence does not support that full-time work would not be possible, given that part-time work is

---

[6] Claimant's argument appears to be largely rooted in a misreading of the DCPH treatment notes.  In particular, she neglects to note that several paragraphs are repeated, verbatim, in many treatment notes, apparently to provide context and background regarding Claimant's condition.  In the "History of Present Illness" section of the notes, for example, the first paragraph describes Claimant's condition generally and remains mostly unchanged at every appointment.  (R. 330, 335, 340, 355, 360, 378, 384).  The second paragraph discusses Claimant's symptoms *at the time of her appointment*.  Accordingly, Claimant's reliance on the first paragraph to describe her condition on October 3, 2017, is misplaced.  (Dckt. #18 at 14) (citing R. 360).  Claimant similarly relies on two other treatment notes that – when read in context – are clearly meant to provide background regarding her condition rather than describe her current state. *See* (R. 365) (section cited by Claimant describes reasons she initially sought or was referred for mental health treatment; (R. 416) (section cited by Claimant describes the "problem" that prompted her to seek treatment and it is repeated in other treatment notes).

so beneficial." (Dckt. #18 at 12) (citing R. 24). However, while Claimant is correct to note that the Seventh Circuit has "cautioned ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment," *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017) (citing cases), the Court finds that the ALJ made no such inference here. Instead, she cited Claimant's statement that "she was benefitting from working part-time" as evidence that her condition had improved since her August 2017 episode. (R. 24). This was a logical inference, which is all that is required of the ALJ's assessment of the evidence. The ALJ further found that the record suggests that Claimant decreased her hours at Goodwill on the recommendation of her social security attorney in order to bolster her disability case. (R. 24).[7]

The Court also notes that this case is distinguishable from *Lanigan,* relied on by Claimant. Unlike in *Lanigan*, the record does not reflect that Claimant was receiving any accommodations from her employer that the ALJ failed to mention. *See Lanigan*, 865 F.3d at 565. Furthermore, while the claimant in *Lanigan* had been on the job for only six weeks – "far too short a time to infer anything about his prospects of maintaining even part-time employment," *id.* – Claimant had been working at Goodwill for more than two years at the time of her hearing. Claimant's demonstrated ability to independently manage her work schedule, interact with co-workers and customers, and perform her job duties is undeniably relevant to her application and the ALJ was permitted to consider it within the proper context. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week

---

[7] On July 12, 2017, Claimant's case manager noted that Claimant had reduced her hours at Goodwill (from 22 hours to 20 hours per week) "as advised by social security attorney." (R. 403). Claimant asserts that the ALJ took the case manager's statement "out of context" because "there is no indication as to why [Claimant's] representative may have recommended this." (Dckt. #18 at 14). The Court disagrees. It is logical to presume that this attorney (who specializes in social security disability (R. 403)) was providing this advice on the belief that it was advantageous for Claimant's social security disability case. Conversely, there is no rational basis to believe that the attorney directed Claimant to reduce her hours to exactly part-time (20 hours) from 22 hours for any health-related reason.

indicated that [the claimant] was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."); *Brenda C. v. Saul*, 1:20-cv-00215-SEB-MPB, 2021 WL 606738, at *5 (S.D.Ind. Jan. 27, 2021) ("The ALJ did not equate Brenda C.'s ability to work at McDonalds for a year with the ability to work on a full-time basis, but concluded that this work history was not consistent with her allegations of limitations. There was no patent error.").

The Court acknowledges that the ALJ's reasoning is not completely airtight. For example, the ALJ's finding that Claimant's reports of fatigue and her request for a day off between shifts were "inconsistent with her recent report in the record that she was performing well at work and getting fair sleep," (R. 24), is unpersuasive. It is entirely possible that Claimant could have asked not to work consecutive days while still performing well at her part-time job. It is also possible that Claimant could get an adequate amount of sleep and still feel tired. *See Martin v. Astrue*, No. 09-1998 (RHK/JJG), 2010 WL 2787437, at *2 (D.Minn. June 7, 2010) (noting that depressed claimant "suffered from fatigue, despite sleeping ten to twelve hours a night and napping daily."). Nonetheless, "[n]ot all of the ALJ's reasons must be valid as long as enough of them are." *Halsell v. Astrue*, 357 Fed.Appx. 717, 722-23 (7th Cir. 2009). Considering the valid reasons the ALJ relied upon to support her assessment of Claimant's subjective symptoms – namely, Claimant's non-severe mental health symptomology and her activities of daily living – the Court is convinced that the ALJ would reach the same result on remand. *See McKinzey*, 641 F.3d at 890 (affirming the ALJ's credibility determination even though only one of the three reasons the ALJ offered was valid); *Kittelson v. Astrue*, 362 Fed.Appx. 553, 557 (7th Cir. 2010) ("The ALJ's adverse credibility finding was not perfect. But it was also not 'patently wrong.'").

> **D.** **The ALJ properly assessed the findings of Claimant's mental health provider and case manager.**

Finally, Claimant argues that the ALJ improperly discredited statements made by one of her mental health providers, Michaela Egert, and her case manager, Ms. Arellano. Again, the Court disagrees.

On August 7, 2018, Ms. Egert, a licensed Mental Health Provider, noted that Claimant "struggles with thoughts and mood, when workload increases or becomes too fast paced," and improves "with limited work hours." (R. 453). The ALJ credited the portion of the statement regarding workload and pace to the extent that she limited Claimant "to simple routine tasks performing the same tasks day in and day out," (R. 25), but discounted it to the extent that it implied that limited work hours were necessary, noting "there was no explanation given as to why the claimant cannot do full-time work." (R. 25).

The Court need not assess the adequacy of the ALJ's reasoning in this regard. Although Ms. Egert noted that Claimant's symptoms had improved with limited work hours, she did *not* opine that Claimant could not undertake full-time work – a finding that would have contradicted the ALJ's assessment. Similarly, Ms. Egert's statement that Claimant "struggled" with increased work, is not the same as an opinion that Claimant could not maintain a full-time work schedule. Accordingly, whether or not the ALJ properly assessed this single treatment note is irrelevant as the note does not contradict the ALJ's findings. *McKinzey*, 641 F.3d at 892 (courts "will not remand a case to the ALJ for further specification where [they] are convinced that the ALJ will reach the same result").

Claimant's case manager, Ms. Arellano, completed a report on her behalf on August 27, 2018. In it, she opined that Claimant's depression markedly restricted her activities of daily

living, socialization, and ability to sustain concentration and attention.  (R. 424-25).  She further

indicated that Claimant would not be able to function in a competitive work setting on a full-time

basis.  (R. 425).  When asked at the hearing whether Claimant has difficulty with activities such

as following through on doctor's appointments, maintaining cleanliness in her unit, and

accessing community support, Ms. Arellano testified that Claimant is "usually very tired," and

sometimes presents as "disheveled."  (R. 63-64).

The ALJ partially credited Ms. Arellano's statements, restricting Claimant's interactions

with others in reliance on Ms. Arellano's suggestion that Claimant had problems with

socialization.  (R. 25).  As for Ms. Arellano's findings of marked limitations, the ALJ discounted

these as inconsistent with the record, which shows that Claimant "is able to live on her own, to

get to and from work on her own, and to handle funds."  (R. 25).  She further found Ms.

Arellano's testimony that Claimant presented as "disheveled" to be inconsistent with her own

case notes and the case notes of others, which generally indicated that Claimant was "well-

groomed."  (*Id*.).  Finally, the ALJ noted that Ms. Arellano's assessment lacked medical support

and that Claimant's daily activities – such as her ability to maintain her work schedule, work

with customers, run errands, go to the library, and go to church – were inconsistent with the

extreme limitations described by her case manager.

Claimant briefly argues that this assessment relied on "improper inferences" and "false

equivalencies," but she fails to point to any.  (Dckt. #18 at 16).  For example, the Court disagrees

with Claimant's assertion that the ALJ's comparison of Ms. Arellano's testimony regarding

Claimant's "disheveled" appearance, (R. 64), with her case notes indicating that Claimant was

"well-groomed," (R. 390-94), constitutes a "false equivalency."  These two observations are,

indeed, at odds with each other and the ALJ was permitted to say so.  *Fair v. Saul*, 853

Fed.Appx. 17, 21 (7th Cir. 2021) (ALJ properly discounted treating physician's opinion where his "own records did not support his conclusions.").

Furthermore, the ALJ did not improperly rely on Claimant's ability to work part-time to discount Ms. Arellano's findings, as Claimant asserts. Rather than equating the capacity to work part-time with the capacity to work full-time, the ALJ reasoned that Claimant's ability to present professionally, maintain a work schedule, and interact with customers was inconsistent with the extreme limitations described by Ms. Arellano. (R. 25). This is not an unreasonable conclusion. As noted above, the ALJ was permitted to consider Claimant's ability to work part-time when assessing the extent of her limitations. And Claimant herself admits that her functional limitations "may indeed be considered moderate," rather than marked. (Dckt. #18 at 9). Accordingly, the Court finds that the ALJ built the requisite logical bridge from the evidence to her decision not to fully credit Ms. Arellano's statement. That is all that is required. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (noting an ALJ must only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability").

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment, (Dckt. #18), is denied and the Commissioner's motion to uphold the decision to deny benefits, (Dckt. #23), is granted. The decision of the ALJ is affirmed.

**ENTERED:   March 17, 2023**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

23